IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-807

Filed: 21 July 2020

Beaufort County, No. 16 CVS 417

CARTER TANKARD SMITH and AMANDA BRAMBLE, as Administratrix, C.T.A. of the Estate of Ruth B. Smith Waters, Plaintiffs,

v.

CHARLES B. SMITH, Individually and as Executor of the Estate of Ruth B. Smith Waters, Defendant.

Appeal by plaintiff Carter Tankard Smith from order entered 2 April 2019 by Judge Jeffery B. Foster in Beaufort County Superior Court. Heard in the Court of Appeals 4 March 2020.

> *Fitzgerald Litigation, by Andrew L. Fitzgerald and D. Stuart Punger, Jr., and Colombo, Kitchin, Dunn, Ball & Porter, LLP, by Micah D. Ball, for plaintiff-appellant Carter Tankard Smith.*
>
> *Ward and Smith, P.A., by John M. Martin, for defendant-appellee.*

ZACHARY, Judge.

Plaintiff Carter Tankard Smith appeals from an order entered granting summary judgment in favor of Defendant Charles B. Smith, and denying Plaintiffs' motion for partial summary judgment. After careful review, we affirm in part, and reverse in part.

## ***Background***

This appeal arises out of the division of the property of Ruth B. Smith Waters. Plaintiff Carter Tankard Smith is one of Ruth's grandchildren, and a beneficiary of

Ruth's estate; Defendant Charles B. Smith is Ruth's only living son, and a beneficiary of Ruth's estate. He served as Ruth's attorney-in-fact and as a former co-executor of Ruth's estate.

In 2007, Ruth executed a power of attorney naming Charles as her attorney-in-fact. Charles acted as Ruth's attorney-in-fact from that time until her death in 2011. In 2007, Ruth and Charles opened a joint account with right of survivorship; they opened another joint account—this one, without right of survivorship—in 2008. These accounts were funded with Ruth's money, and the bank statements were mailed to Ruth. Charles had online access to all of Ruth's accounts. While serving as Ruth's attorney-in-fact, Charles transferred substantial amounts of Ruth's funds from her individual accounts to the joint accounts, and he spent a portion of Ruth's funds on his expenses, as well as some of his wife's and stepdaughter's expenses.

In 2010, Ruth prepared her holographic will. In her will, Ruth named Charles and her cousin, Betty Gurganus, to serve as co-executors of her estate. She also directed that her residuary estate be divided equally between Charles and Carter. Ruth died on 24 December 2011, and her will was offered for probate on 4 January 2012. That same day, Charles and Betty qualified as co-executors of Ruth's estate. Betty resigned as co-executor in 2013.

Upon Ruth's death, several valuable parcels of real property that she owned passed by operation of law, outside of the administration of the estate, to Charles and

Carter as tenants in common. In 2013, Carter told Charles that she wanted to work on "settling the estate and . . . divid[ing] the assets." However, shortly after Ruth's death, Carter began to have suspicions regarding Charles's handling of the administration of the estate. Carter shared her misgivings with Betty, who implied that Charles could not be trusted. Upon Betty's advice, Carter hired an attorney to protect her interest in the estate. Carter and her attorney began negotiating the property division with Charles.

Charles testified at his deposition that he "talked to [Carter] about [thinning the timber on the property] and told her that . . . it needed to be thinned." However, Carter averred that Charles merely "mentioned there would be money available if it was cut, but not the value and not any details." In May 2013, Charles had the timber thinned on the "Jackson Swamp parcel." Charles deposited the proceeds from the timber sale into the estate checking account. Thereafter, Charles periodically sent checks to Carter's attorney, which Carter eventually confirmed were for her half of the proceeds from the timber sale.

Later, Charles, Carter, and Carter's attorney agreed to have the real property appraised, both for tax purposes and to facilitate a division. The appraisal of all of the real property was completed on 18 September 2013; however, the appraisal noted that "[i]t is not the intent of this report to evaluate any standing timber or wood

products present on any of the tracts." According to the appraiser, wooded land is typically valued as if it were "cut over."

The appraisal also provided that "only the value of the underlying land [was] considered" in estimating the value of the wooded portions of the properties, and that "[t]he client is in the process of obtaining an independent timber valuation." Although she was represented by counsel, Carter assumed that this language indicated that "a general value, instead of a specific value, for the timber had been applied to the full appraised value of the real property." Charles emailed Carter's attorney and asked whether he and Carter wanted to have the timber valued in addition to the real property appraisal, offering to "do whatever [Carter and her attorney] wish[ed,]" but neither party asserts that the topic was broached again.

With appraisal in hand, and after extensive negotiation, on 2 April 2014, the parties reached an agreement regarding the division of the real property, with Charles receiving the Jackson Swamp parcel and house, which were appraised at $1,119,816.00, and Carter receiving two other pieces of real property, which were appraised at $1,119,500.00. After the requisite deeds were executed and recorded, Charles sold the timber on the Jackson Swamp parcel for $258,004.96.

On 16 June 2016, Carter filed a complaint against Charles, asserting claims for (1) constructive fraud while acting as attorney-in-act, (2) breach of fiduciary duty while acting as attorney-in-fact, (3) actual fraud, (4) constructive fraud while acting

as executor, (5) negligent misrepresentation, (6) intentional interference with inheritance, (7) constructive trust, (8) accounting, (9) conversion while acting as attorney-in-fact, (10) undue influence, (11) breach of fiduciary duty while acting as executor, (12) conversion while acting as executor, (13) punitive damages, and (14) injunctive relief. Charles filed his answer to Carter's complaint on 3 August 2016, and his amended answer on 26 January 2017.

At some point in 2016, Charles resigned as executor. Amanda Bramble was appointed to serve as administratrix c.t.a. of the estate, and on 19 April 2017, the trial court ordered that Bramble, in her capacity as administratrix c.t.a., be joined as a necessary plaintiff in the instant action. On 5 December 2018, the Chief Justice of the North Carolina Supreme Court designated this matter as an exceptional civil case pursuant to Rule 2.1 of the General Rules of Practice, and assigned the Honorable Jeffery B. Foster to preside over the case.

On 4 February 2019, Charles moved for summary judgment on all claims. The following day, Plaintiffs moved for partial summary judgment. Judge Foster held a hearing on both parties' motions on 14 February 2019 in Beaufort County Superior Court. By order entered 2 April 2019, the trial court granted Charles's motion for summary judgment on all claims, and denied Plaintiffs' motion for partial summary judgment. Carter timely appealed the order on 24 April 2019.[1]

---

[1] Bramble, as administratrix c.t.a., did not join Carter's appeal.

### *Discussion*

Carter raises two arguments on appeal in support of her position that the trial court erred by granting summary judgment in favor of Charles. She asserts that there exists a genuine issue of material fact as to (1) whether Charles improperly transferred Ruth's assets to himself and others while he was acting as her attorney-in-fact; and (2) whether Charles "misrepresented and failed to disclose" the true value of the Jackson Swamp parcel while the parties negotiated the division of real property.

### I.  *Standard of Review*

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation and internal quotation marks omitted). "The trial court may not resolve issues of fact and must deny the motion if there is a genuine issue as to any material fact. Moreover, all inferences of fact must be drawn against the movant and in favor of the party opposing the motion." *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007) (internal quotation marks and citations omitted).

"The party moving for summary judgment bears the burden of establishing that there is no triable issue of material fact": either that "an essential element of the

opposing party's claim is nonexistent," or that "the opposing party cannot produce evidence to support an essential element of his claim[.]" *Badin Shores Resort Owners Ass'n v. Handy Sanitary Dist.*, 257 N.C. App. 542, 549, 811 S.E.2d 198, 204 (2018) (citation omitted). "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784-85, 534 S.E.2d 660, 664 (emphasis omitted), *disc. review denied*, 353 N.C. 262, 546 S.E.2d 401 (2000).

## II. *Dead Man's Statute*

At the outset, we address Carter's assertion that pursuant to Rule 601(c) of the North Carolina Rules of Evidence, "[e]ven if the authority granted under a power of attorney could be orally expanded by a principal, an attorney-in-fact cannot testify as to those statements if the principal is dead." She then states that Charles "repeatedly testified as to his oral communications with Ruth," and that this Court should disregard those statements.

Commonly referred to as the "Dead Man's Statute," Rule 601 "exclude[s] evidence of the acts or statements of deceased persons, since those persons are not available to respond." *Culler v. Watts*, 67 N.C. App. 735, 737, 313 S.E.2d 917, 919 (1984); *see also* N.C. Gen. Stat. § 8C-1, Rule 601 (2019). However, Carter does not

allege that the trial court erred by considering any incompetent evidence, and this issue will not be addressed. N.C.R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."). Regardless, to the extent that Charles's testimony contained evidence violative of Rule 601, "we assume the trial court properly disregarded [it]." *Forbis*, 361 N.C. at 526, 649 S.E.2d at 387.

### III.  *Transfer Claims*

In her complaint, Carter raised the following claims, among others: (1) constructive fraud while acting as attorney-in-fact, (2) breach of fiduciary duty while acting as attorney-in-fact, (3) constructive trust, and (4) conversion while acting as attorney-in-fact. These claims arise out of Charles's transfers of funds to joint accounts, as well as expenditures made from the joint accounts to his benefit (collectively, the "Transfer Claims").

Carter first argues that "[t]he trial court erred by granting summary judgment in Charles's favor on Carter's claims arising out [of] Charles's transfers of Ruth's assets to himself, his immediate family, and others while he was Ruth's attorney-in-fact." Specifically, she maintains that there are genuine issues of material fact as to whether Charles, while acting as Ruth's attorney-in-fact, improperly transferred substantial funds from Ruth's individual accounts to accounts that he and Ruth held jointly; and whether Charles improperly spent funds from the joint accounts on his

personal expenses and those of his family. Carter explains that "[b]ecause Charles owed a fiduciary duty to Ruth and benefitted [sic] from the transactions he initiated, he bears the duty of proving that his gifts of Ruth's assets were made in accordance with Ruth's lifetime history of gift-giving[,]" which Carter suggests shows that Ruth would not have gifted Charles nearly as much money as he received after becoming her attorney-in-fact.

On 10 January 2007, Ruth executed a "North Carolina Statutory Short Form of General Power of Attorney" appointing Charles to serve as her attorney-in-fact, and authorizing him "to act in [her] name in any way which [she] could act for [her]self," for the purposes set forth in Chapter 32A of our General Statutes. In this power of attorney, Ruth gave Charles the specific authority to make "gifts to charities, and to individuals other than the attorney[-]in[-]fact," and to make "gifts to the named attorney[-]in[-]fact." However, Chapter 32A limits the authority of an attorney-in-fact to make gifts:

> (a) Except as provided in subsection (b) of this section, if any power of attorney authorizes an attorney-in-fact to do, execute, or perform any act that the principal might or could do or evidences the principal's intent to give the attorney-in-fact full power to handle the principal's affairs or deal with the principal's property, *the attorney-in-fact shall have the power and authority to make gifts in any amount of any of the principal's property to any individual or to any organization . . . in accordance with the principal's personal history of making or joining in the making of lifetime gifts. . . .*

(b) Except as provided in subsection (c) of this section, *or unless gifts are expressly authorized by the power of attorney*, a power described in subsection (a) of this section may not be exercised by the attorney-in-fact in favor of the attorney-in-fact or the estate, creditors, or the creditors of the estate of the attorney-in-fact.

N.C. Gen. Stat. § 32A-14.1(a)-(b) (repealed 1 January 2018) (emphases added).[2]

It is against this backdrop that we evaluate Carter's claims for constructive fraud, breach of fiduciary duty, constructive trust, and conversion.

### A. Constructive Fraud, Breach of Fiduciary Duty, and Constructive Trust Claims

The gifting proviso in Chapter 32A is limited by the common law precept that "an attorney-in-fact is presumed to act in the best interests of the principal." *Hutchins v. Dowell*, 138 N.C. App. 673, 676, 531 S.E.2d 900, 902 (2000) (citation omitted). As noted by this Court in *Huneycutt v. Farmers & Merchs. Bank*, 126 N.C. App. 816, 819-20, 487 S.E.2d 166, 168 (1997), the statutory language of N.C. Gen. Stat. § 32A-14.1 was intended to codify North Carolina common law, under which the principal's needs are of paramount importance. *See also Albert v. Cowart*, 219 N.C. App. 546, 554, 727 S.E.2d 564, 570 (2012) ("The relationship created by a power of attorney between the principal and the attorney-in-fact is fiduciary in nature . . . ." (citation and internal

---

[2] Much of Chapter 32A, "Powers of Attorney," was repealed in 2017 and replaced by Chapter 32C, the "North Carolina Uniform Power of Attorney Act," effective 1 January 2018. N.C. Gen. Stat. § 32C-4-403(d) (2019) provides that "the powers conferred by former [N.C. Gen. Stat. §] 32A-2 shall apply to a Statutory Short Form Power of Attorney that was created in accordance with former [N.C. Gen. Stat. §] 32A-1 prior to January 1, 2018."

quotation marks omitted)). As a fiduciary, an attorney-in-fact "may not place himself in a position where his own interest may conflict with the interest of those for whom he acts." *Moore v. Bryson*, 11 N.C. App. 260, 267, 181 S.E.2d 113, 117 (1971).

The elements of Plaintiff's Transfer Claims for constructive fraud, breach of fiduciary duty, and constructive trust, are similar in nature. Constructive fraud "arises where a confidential or fiduciary relationship exists, which has led up to and surrounded the consummation of the transaction in which [the] defendant is alleged to have taken advantage of his position of trust to the hurt of [the] plaintiff." *Forbis,* 361 N.C. at 528, 649 S.E.2d at 388 (citations and internal quotation marks omitted). "To establish a claim for breach of a fiduciary duty, claimants are required to produce evidence that (1) [the] defendant[ ] owed them a fiduciary duty of care; (2) [the] defendant[ ] violated [his] fiduciary duty; and (3) this breach of duty was a proximate cause of injury to [the] plaintiffs." *French Broad Place, LLC v. Asheville Sav. Bank, S.S.B.*, 259 N.C. App. 769, 787, 816 S.E.2d 886, 899 (2018) (citation and internal quotation marks omitted). A constructive trust "is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it[.]" *Roper v. Edwards*, 323 N.C. 461, 464, 373 S.E.2d 423, 424-25 (1988) (citation omitted). "[T]he plaintiffs, by alleging that a fiduciary relationship existed, that a fiduciary duty was

breached, and that the defendants gained because of that breach have made a claim for constructive trust." *Cury v. Mitchell*, 202 N.C. App. 558, 561, 688 S.E.2d 825, 828 (citation and internal quotation marks omitted), *disc. review denied*, 364 N.C. 434, 702 S.E.2d 300 (2010).

Here, these three claims—constructive fraud, breach of fiduciary duty, and constructive trust—are all predicated upon Charles's alleged breach of fiduciary duty. *See, e.g.*, *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (breach of fiduciary duty claim); *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293-94, 603 S.E.2d 147, 155-56 (2004) (breach of fiduciary duty and constructive fraud claims), *disc. review denied*, 359 N.C. 286, 610 S.E.2d 717 (2005); *In re Gertzman*, 115 N.C. App. 634, 640, 446 S.E.2d 130, 135 (constructive trust claim), *disc. review denied*, 337 N.C. 801, 449 S.E.2d 571 (1994).

Upon his motion for summary judgment of these claims, Charles bore the burden of proof of showing either that "an essential element of [Carter's] claim [wa]s nonexistent," or that Carter could not "produce evidence to support an essential element of h[er] claim[.]" *Badin Shores*, 257 N.C. App. at 549, 811 S.E.2d at 204 (citation omitted). Nevertheless, these claims could not survive a motion for summary judgment without a forecast of evidence that Charles breached his fiduciary duty to Ruth. *See* N.C. Gen. Stat. § 1A-1, Rule 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon

the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

To begin, Carter characterizes the transfers as "exorbitant gift-giving" beyond the scope of Charles's gifting authority under the power of attorney, and in violation of his fiduciary duty. However, as Carter acknowledges in support of her challenge to Charles's expenditures from the joint accounts, transferring money from an individual account into a joint account does not constitute a gift. For a deposit to constitute a gift, "there must be an intention to give coupled with a delivery of, and loss of dominion over, the property given . . . . Such gift cannot be made to take place in the future." *Albert*, 219 N.C. App. at 555, 727 S.E.2d at 571 (citation omitted). In the instant case, Ruth did not lose "dominion over" the funds that Charles transferred from her individual accounts into the joint accounts. Ruth maintained the ability to make deposits and withdrawals; she could even close the accounts. Consequently, Charles did not make any gifts to himself when he transferred funds from Ruth's individual accounts into the joint accounts.

Nonetheless, the transfers from Ruth's individual accounts to the joint accounts, as well as Charles's payment of his personal expenses from the joint accounts, if unauthorized, could constitute a breach of fiduciary duty. Indeed, there is evidence that the actions were authorized. The bank signature cards indicate that

the joint accounts were opened by Ruth and Charles together, with Ruth's full consent. Moreover, the power of attorney authorized Charles to make gifts to himself and others, although only to a limited extent. However, it is undisputed that Charles and Ruth were in a fiduciary relationship, by virtue of the power of attorney. *See Estate of Graham v. Morrison*, 168 N.C. App. 63, 74, 607 S.E.2d 295, 303 (2005). If the transfers and expenditures were unauthorized, Charles's actions could have breached his fiduciary duty to Ruth.

In response, Charles supported his motion for summary judgment with his 12-page affidavit, together with the affidavits of Thomas B. Ormond, Jr., Tori Wicker, Betty Gurganus, John Baldwin, and Reuben Braddy. Charles attested that Ruth both knew and approved of the transfers and expenditures. Others averred that the gifts were in accordance with Ruth's established pattern of gifting, and that Ruth was a mentally sharp and alert businesswoman: she was aware of every monetary decision, and she would never allow anyone to take advantage of her.

Regarding Charles's attempt to start a business, Braddy averred that, because Ruth "wanted Charles to move back to Bath[,]" "she suggested that he start some type of business venture in Beaufort County[,]" and that he use funds from one of the joint accounts to pay for it. As for other expenditures, Charles consistently maintained that Ruth approved of such transactions "out of love" and to make it possible for him to live closer to her. Betty similarly attested that Ruth intended to provide for Charles,

while Braddy noted that Ruth "allowed Charles to have full access to their joint accounts."

Carter forecast evidence that Charles benefited from the payment of his personal expenses, and that he benefited at Ruth's death from the transfers into the joint accounts, and that Ruth's estate was damaged by Charles's transfers and expenditures. Charles admitted, in response to Carter's requests for admission, that (1) "not all transfers of money made . . . from [Ruth's] financial accounts . . . from 10 January 2007 to the date of [Ruth's] death were gifts from [Ruth]"; (2) "some transfers . . . were not made to compensate [him] for services rendered to [Ruth]"; and (3) he "did not deposit any of [his] personal funds into any of [Ruth's] individual or joint financial accounts after 10 January 2007." Furthermore, there were numerous instances in which Charles withdrew money from Ruth's accounts to cover his own expenses, and those of his family members. When asked, Charles could not explain how all of these expenditures benefited Ruth.

Thus, contrary to the trial court's determination, the evidence presented at the summary judgment hearing raised a genuine issue of material fact as to whether Charles breached his fiduciary duty to Ruth by paying his personal expenses and those of his immediate family from the joint accounts, or by transferring funds from Ruth's individual accounts to accounts held jointly by Charles and Ruth. In particular, a genuine issue of fact exists regarding Ruth's history of gifting, as well

as her knowledge and authorization of Charles's transfer of a substantial portion of her funds into joint accounts. Therefore, the trial court erred in granting summary judgment in favor of Charles as to Carter's claims for constructive fraud, breach of fiduciary duty, and constructive trust.

*B. Conversion Claim*

Conversion is defined as "the unauthorized assumption and exercise of the right of ownership over the goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *White v. White*, 76 N.C. App. 127, 129, 331 S.E.2d 703, 704 (1985) (citation omitted).

*(i)     Transfers to Joint Accounts*

Charles's transfers of funds from Ruth's individual accounts to the joint accounts do not satisfy the elements of a claim for conversion. Although Charles acquired access to the funds in the joint accounts, and the transfers substantially reduced the size of Ruth's estate, Ruth was never deprived of her funds. "The essence of conversion is not the acquisition of property by the wrongdoer, but a *wrongful deprivation* of it to the owner[.]" *Lake Mary Ltd. P'ship. v. Johnston*, 145 N.C. App. 525, 532, 551 S.E.2d 546, 552 (emphasis added) (citation omitted), *disc. review denied*, 354 N.C. 363, 557 S.E.2d 539 (2001). Therefore, there being no genuine issue of material fact, summary judgment in favor of Charles was proper on the claim of conversion by transfer of funds from individual accounts to joint accounts.

*(ii)     Use of Funds for Personal Expenses*

We next address Charles's use of Ruth's funds to pay his personal expenses, as well as those of his immediate family. Here, Ruth was clearly deprived of her funds, but it is not evident that Charles's actions were unauthorized. In addition, the power of attorney under which Charles acted provided him with the limited authority to make gifts to himself and others "in accordance with [Ruth's] personal history of making or joining in the making of lifetime gifts." *Hutchins*, 138 N.C. App. at 677, 531 S.E.2d at 902 (citation omitted).

As described above, the parties' forecast of the evidence demonstrated that genuine issues of material fact exist as to whether the expenditures were unauthorized by Ruth, or not made in accordance with Ruth's history of gifting. Thus, summary judgment in favor of Charles was improper on the claim of conversion by expenditure of Ruth's funds on personal expenses.

IV.  *Real Property Division Claims*

Carter next asserts separate claims against Charles arising from the land division, namely (1) constructive fraud while acting as executor, (2) breach of fiduciary duty while acting as executor, (3) negligent misrepresentation, and (4) punitive damages (collectively, the "Real Property Division Claims"). These claims originate from Carter and Charles's division of the real property that they inherited as tenants in common upon Ruth's death.

Here, Carter contends that "[t]he trial court erred when it granted summary judgment in Charles's favor on Carter's claims arising out of Charles's misrepresentation of, and failure to disclose, the true value of land that he was splitting with Carter while he was her cotenant and executor of Ruth's estate." According to Carter, during negotiations regarding the parties' division of the real property, Charles misrepresented the true value of the Jackson Swamp parcel by failing to inform Carter that it contained valuable standing timber, and by allowing Carter and her attorney to rely on an appraisal of the property that valued the property as if it were "cut over." Carter further claims that Charles's actions constituted a breach of his fiduciary duty to her, both as a cotenant of the real property that they inherited, and as the executor of Ruth's estate. We disagree.

As presented by Carter, the success of each of these claims is dependent upon a forecast of evidence establishing that Charles had a fiduciary duty to Carter, which he breached. While the existence of a breach of fiduciary duty is an element of claims for constructive fraud and breach of fiduciary duty, *see, e.g.*, *Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 28, 560 S.E.2d 817, 823, *disc. review denied*, 356 N.C. 164, 568 S.E.2d 196 (2002), it is not an element of a claim for negligent misrepresentation.

"It has long been held in North Carolina that the tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying

party a duty of care." *Walker v. Town of Stoneville*, 211 N.C. App. 24, 30, 712 S.E.2d 239, 244 (2011) (citation and internal quotation marks omitted). Nonetheless, Carter maintains that a fiduciary relationship existed between Charles and her, and that therefore Charles had a duty to disclose, she had no duty to investigate, and she need not prove reasonable reliance. In Carter's analysis, she prevails on each of these claims—constructive fraud, breach of fiduciary duty, and negligent misrepresentation—upon a forecast of evidence that "Charles owed her a fiduciary duty and failed to fully disclose all material facts surrounding the division of the property." Carter did not make that forecast at summary judgment.

"Fiduciaries must act in good faith. They can never paramount their personal interest over the interest of those for whom they have assumed to act." *Albert*, 219 N.C. App. at 554-55, 727 S.E.2d at 570 (citation omitted). A fiduciary duty exists where there is a fiduciary relationship, with "confidence reposed on one side, and resulting domination and influence on the other." *Id.* at 554, 727 S.E.2d at 570 (citation and emphasis omitted).

It is axiomatic that "[a]n executor acts in a fiduciary capacity." *In re Will of Covington*, 252 N.C. 551, 553, 114 S.E.2d 261, 263 (1960). However, the duties of an executor do not extend to assets passing outside of the estate. *See* N.C. Gen. Stat. §§ 28A-13-3 & 28A-15-1(a). Where the estate has sufficient assets to satisfy its debts,

the real property ordinarily passes by operation of law to the heirs, who inherit the property as tenants in common. *See id.* § 28A-15-2(b).

"[A] fiduciary relationship ordinarily does not arise between tenants in common[.]" *Moore*, 11 N.C. App. at 265, 181 S.E.2d at 116. Nonetheless, a fiduciary relationship "may be created by . . . conduct, as where one cotenant assumes to act for the benefit of [his] cotenants." *Id.* (citation and internal quotation marks omitted). As our Supreme Court has explained, "a fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Kapp v. Kapp*, 336 N.C. 295, 301, 442 S.E.2d 499, 502 (1994).

In the instant case, we consider whether Charles, "as an executor[,] . . . as a cotenant, or simply as an individual, . . . undertook to manage and generally control" the parties' inherited real property for Carter's benefit, causing her to repose "special faith, confidence and trust in him to represent [her] best interest with respect to the property[,]" and thereby creating a fiduciary relationship between them, which she alleges he breached. *Moore*, 11 N.C. App. at 265, 181 S.E.2d at 116. After careful review, it is evident that Carter did not repose a special faith or trust in Charles, that she did not rely on his advice, and therefore, that no fiduciary relationship existed.

First, Carter did not trust Charles "to represent [her] best interest with respect to the property." *Id.* Indeed, she repeatedly expressed her distrust of Charles. As Carter explained in her deposition, she became suspicious of Charles shortly after Ruth passed away, during the estate administration. Because of her skepticism, Carter spoke to Betty, who implied that Charles could not be trusted. She also testified that "[Betty] felt because she was being left unaware" of what Charles was doing in the administration of the estate, Carter should "protect [her]self" by securing legal representation, which she did. Furthermore, Carter testified that even after hiring an attorney, she was "suspicious that [Charles] was not administering the estate correctly[,]" and thought Charles "was dishonest at that point in time[.]"

Moreover, it is clear that upon retaining an attorney, Carter did not rely on Charles's advice. *Cf. Albert*, 219 N.C. App. at 554, 727 S.E.2d at 570. Carter hired an attorney to represent her interest in the division of Ruth's estate approximately one year after Ruth died. From that point forward, Charles dealt with Carter's attorney, or with Carter and her attorney together. Charles testified at his deposition that Carter instructed Charles "not to talk to her directly anymore." Consequently, upon receipt of the appraisal, Charles sent a copy to Carter's attorney. Carter testified that after receiving the appraisal, she read it carefully, her attorney reviewed it in detail, and they discussed it multiple times before they engaged in further negotiations with Charles. By October 2013, Carter had authorized her attorney to communicate

directly with Charles, and they "commonly conversed . . . and then . . . just copied [Carter] on the emails[,]" although Carter also occasionally made direct proposals to Charles regarding the property division. Negotiations between Carter's attorney and Charles continued for "[q]uite some time" before Carter accepted any offer regarding the land division. Thus, Carter's own testimony demonstrated that she relied on the advice and counsel of her attorney, rather than Charles.

Nor does the evidence forecast in this matter establish that Charles attempted to dominate Carter or influence her decisions. Charles emailed Carter's attorney to discuss having the real property appraised, and he offered to hire "Respess or someone else of your choosing" to conduct the appraisal. Carter decided to hire Respess of her own volition. Charles also asked Carter's attorney for input on whether to have the timber valued; Charles agreed to "do whatever [Carter and her attorney] wish[ed]," but neither party contends that the issue was raised again.

Finally, Carter makes no forecast that she was dependent on Charles to protect her interest in the real property. In addition to retaining an attorney because she did not trust Charles, evidence was forecast that Charles told Carter that "there would be money available if [the timber] was cut," that she received checks from Charles for the earlier sale of timber, and that Charles asked whether she wanted the remaining timber valued. The evidence also shows that the appraisal itself makes clear that the property was valued as "cut over," as Respess stated is typical, explicitly noting that

"[i]t is not the intent of this report to evaluate any standing timber or wood products present on any of the tracts"; that "only the value of the underlying land is considered" in estimating the value of the wooded portions of the properties; and that "[t]he client is in the process of obtaining an independent timber valuation."

In sum, even when viewing the evidence presented in the light most favorable to Carter, there exists no genuine issue of material fact regarding the Real Property Division claims. Accordingly, the trial court properly granted summary judgment on Carter's Real Property Division Claims for constructive fraud, breach of fiduciary duty, negligent misrepresentation, and punitive damages.

## V. *Claims Abandoned on Appeal*

Carter makes no argument that the trial court erred in granting summary judgment in favor of Charles with regard to her claims of actual fraud, intentional interference with inheritance, undue influence, conversion while acting as executor, accounting, injunctive relief, and punitive damages for the Transfer Claims. "Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned." N.C.R. App. P. 28(b)(6); *see Forbis*, 361 N.C. at 526, 649 S.E.2d at 387 ("Although the original complaint alleged various causes of action including fraud, undue influence, and breach of fiduciary duty, [the] plaintiffs did not brief the undue influence and breach of fiduciary duty claims before this Court and thereby abandoned them."). Accordingly, these issues will not be addressed.

### *Conclusion*

For the foregoing reasons,  we reverse the trial court's order granting summary judgment of the claims for (1) constructive fraud while acting as attorney-in-fact, (2) breach of fiduciary duty while acting as attorney-in-fact, (3) constructive trust, and (4) conversion while acting as attorney-in-fact with regard to the expenditure of the principal's funds. We affirm the trial court's order granting summary judgment of the remaining claims.

AFFIRMED IN PART AND REVERSED IN PART.

Judges DILLON and HAMPSON concur.